**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DIVERSIFIED BOTANICS, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11589 |

**DECLARATION OF RYAN NIDDEL IN SUPPORT OF**
**DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Ryan Niddel, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Executive Officer of Diversified Botanics, Inc. ("***Diversified***," the "***Debtor***," or the "***Company***"), formerly known as MIT45, Inc. and SSV, LLC, in the above-captioned chapter 11 case (the "***Chapter 11 Case***"). Diversified is a corporation duly organized and existing under the laws of the State of Delaware. Its principal place of business is located in Draper, Utah.

2. As a result of my tenure with Diversified, I am intimately familiar with its business, financial affairs, and operations.

3. On October 7, 2026 (the "***Petition Date***"), the Debtor filed a voluntary petition for bankruptcy relief in the United States Bankruptcy Court for the District of Delaware (the "***Court***"). The Debtor intends to continue to operate its business and manage its properties as a debtor in possession during the pendency of this Chapter 11 Case and ultimately reorganize through a confirmed plan.

4. Except as otherwise indicated, I base all facts set forth in this Declaration on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtor's operational and financial condition. If called

to testify, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtor.

5. I submit this Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for bankruptcy relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***") and (b) "first day" pleadings, which are being filed concurrently herewith (collectively, the "***First Day Motions***"). The Debtor seeks the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of this Chapter 11 Case on its business and operations. I have reviewed the Debtor's petition and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and to successfully maximize the value of the Debtor's estate.

## PRELIMINARY STATEMENT

6. The Company was originally formed in 2012 by Robert Shawn Brady and Adam Dalton Locke as SSV, LLC a Nevada limited liability, which was converted into MIT45, Inc., a Delaware corporation, as of September 30, 2022 and renamed Diversified Botanics, Inc. on or about July 30, 2025. I joined the Company in 2019 and subsequently became the chief executive officer in approximately 2021. Since October 2022, Robert Shawn Brady (Chairman), Adam Dalton Locke, and I have served as the Board of Directors for the Company. The Company operates within the kratom industry – a sector of the botanical products marketplace focused on products derived from the Mitragyna speciosa tree, a tropical evergreen tree native to Southeast Asia.

7. The Company is wholly-owned by Diversified Botanics Holdings, Inc. ("***Holdings***"). Robert Shawn Brady serves as the President of Holdings, which is owned by Royalty Business Trust F/B/O Robert Shawn Brady, Royalty Business Trust F/B/O Adam Dalton

Locke, and BTM LLC (which is an entity I own and manage).

8. The Company develops, manufactures, and scales functional botanical products across multiple wellness categories, including performance, recovery, mood and cognition. The Company's brands include MIT45, Golden Monk, Kavaa, and Uprising. The Company's flagship product is MIT45 Gold, which is described in greater detail below, and is an innovative, first of its kind kratom extract.

9. Diversified is a science-driven, quality-focused botanical wellness company that develops products well above industry standards. Since its formation, the Company has worked to provide a product that puts the consumer first. Recently, there has been widespread confusion about the kratom industry, particularly as it relates to the difference between kratom and 7-hydroxymitragynine ("***7-OH***"). 7-OH is a naturally occurring opioid-like metabolite of kratom that increases as the kratom leaf degrades. While competitors have produced products with high 7-OH content, at no point has Diversified developed, manufactured, or sold 7-OH products. In fact, Diversified deliberately made the decision in 2023 not to do so given the risks to consumers.

10. As discussed in further detail below, while Diversified has been a successful business with approximately $98 million in annualized revenue at its peak, the recent confusion in the market regarding kratom and 7-OH, among other factors, has created a financial hardship that necessitated the filing of this bankruptcy.

11. To familiarize the Court with the Debtor and the relief the Debtor seeks at the beginning of this Chapter 11 Case, this Declaration is organized in three sections. The first section provides background with respect to the Debtor's business. The second section describes the circumstances surrounding the commencement of this Chapter 11 Case. The last section sets forth relevant facts in support of the First Day Motions.

## THE DEBTOR'S BUSINESS

12. The Company's flagship product, MIT45 Gold, is a kratom extract designed to assist users with mental clarity and higher energy. The Company also owns the brands Golden Monk (whole leaf kratom), Kavaa (kava), and Uprising (kratom). Each ingredient used and the finished products themselves undergo rigorous testing pursuant FDA guidelines as well as the Company's internal protocols to ensure the highest quality standards prior to any sale. The Company's products are designed to elevate everyday living and set a new standard for botanical wellness.

13. Recently, kratom and 7-OH have been the subject of varying legislation and concerns raised by consumers and the popular press. This is largely due to confusion with kratom products versus 7-OH products. Kratom's principal active alkaloid is mitragynine. Kratom-based products – including all products manufactured and sold by Diversified – contain naturally derived mitragynine in controlled, standardized concentrations. The Company's products are manufactured from plant material through highly tested extraction processes.

14. 7-OH on the other hand is a structurally related but pharmacologically distinct compound from kratom. 7-OH is a naturally occurring opioid-like metabolite in kratom. When produced synthetically or semi-synthetically for commercial sale, 7-OH is estimated to be between ten (10) and thirty (30) times more potent than morphine. 7-OH carries a significantly elevated risk profile for addiction, dependency, and adverse health outcomes.

15. Unlike other kratom products on the market, however, MIT45 Gold's formula reduces the amount of 7-OH in the extract. Specifically, where whole-leaf kratom has roughly 800 parts of 7-OH per 1,000,000 (0.08%), MIT45 Gold has roughly 57 parts per 1,000,000 (i.e. 0.0057%), substantially below even the strictest state requirements (0.4% in Utah). Highlighting

the difference between the Company's most popular kratom product and the concentrated 7-OH products commonly sold by the Company's competitors, a consumer would have to consume approximately 157 bottles (2.355L) of the Company's MIT45 Gold product to consume the level of 7-OH found in just three 22 milligram tablets of 7-OH.

16. Diversified does not manufacture, has never commercially sold, and has affirmatively refused to produce 7-OH products. As noted above, in 2023, Diversified made the deliberate decision not to manufacture 7-OH products for concerns about the risks to consumers. Competitors did not make the same decision as Diversified, and in mid-2024, 7-OH products proliferated throughout the market creating consumer confusion and regulatory backlash that has harmed the kratom industry as a whole and Diversified in particular.

17. Throughout its history, the Company has pursued — and in many cases established — what it believes to be class-leading compliance standards in the kratom industry. These measures include, but are not limited to:

a. Standardized serving sizes of twenty-five (25) milligrams of mitragynine across all products;

b. Metered servings designed for ease of consumer understanding and responsible use;

c. Child-resistant, tamper-evident packaging on all products;

d. Age-gating with prominent "21 and Over" labeling in large, legible fonts;

18. Real-time, scannable QR codes that share certificates of analysis for every product at point of sale;

a. 24/7, 365-day live video feeds of all manufacturing processes, open to public inspection; and

b. An open-source business model designed to invite industry and regulatory scrutiny.

19. These measures have been implemented, maintained, and, particularly with respect to the packaging redesign described below, expanded at considerable expense.

## EVENTS LEADING TO THE CHAPTER 11 CASE

20. As described herein, this Chapter 11 Case is primarily the result of widespread market confusion between kratom and 7-OH products and, more specifically, lawsuits relating to the same and recent legislation in the State of Utah that prohibits the manufacturing of all kratom extract products in the state.

### *Market Disruption from 7-OH Products*

21. As described above, the introduction of synthetic 7-OH products into the marketplace beginning in mid-2024 created severe headwinds for the Company's business. Consumer confusion between kratom and 7-OH has led to a generalized perception that "kratom is harmful" – a characterization the Company vigorously disputes and which it believes is properly directed at 7-OH, not at kratom. This confusion has compressed both the Company's sales volume and its margins at precisely the moment when its fixed-cost structure had expanded to serve a larger business.

22. Further, on May 6, 2026, the State of Utah enacted legislation prohibiting the production and sale of kratom extracts or products made from kratom extracts that are not considered "pure leaf kratom." Utah Code § 4-45-102(1) (2026). Under this new law, the Utah legislature has provided that kratom processors such as the Debtor may continue to manufacture products that are not considered pure leaf kratom in Utah until March 6, 2027; provided that such product is not offered for retail sale or distribution in Utah, is manufactured and distributed for

lawful sale in another state, and does not contain 7-OH at a level greater that 0.4% of the total kratom alkaloid composition of the products. Utah Code § 4-45-102(5). Again, Diversified's highest concentration kratom extract product is 0.0087% per serving, substantially less than the level set by the Utah legislature. However, because of the new Utah regulations, the Debtor ceased manufacturing its products in Utah on or about July 31, 2026 and is continuing to lawfully sell its existing product inventory—all of which are below the 7-OH limits under the new law—in other states. The Debtor is currently contracting with a third-party located in Missouri for manufacturing and production of its products without sacrificing the standards the Company implemented and demanded when it manufactured its own products.

*Litigation Burden*

23. The Company is presently a defendant in multiple litigations brought by plaintiffs' firms operating on a contingency-fee basis, claiming wrongful death. These actions target the Company in its capacity as one of the largest and most visible kratom companies in the United States. The Company maintains that the claims are baseless and intends to defend itself vigorously.

24. However, the cost of that defense is substantial. The Company's monthly legal expenditures in connection with these actions fluctuate between approximately $40,000 and $120,000. At the Company's current revenue levels, these defense costs represent a material and, at times, existential drain on operating cash flow.

25. Further, the Company is also subject to ongoing litigation regarding trademark infringement claims brought by the Massachusetts Institute of Technology, wrongful termination by a former employee, and general collection actions for purported services provided to the Company.

26. The Company submits that the automatic stay afforded by section 362 of the

Bankruptcy Code is essential to its ability to stabilize operations and pursue a viable path forward.

*The 2024–2025 Packaging Transition*

27. In addition to the increase of 7-OH products in the market and litigation, the Company also underwent financial stress when it elected to change its packaging for the benefit of consumers and expand its facilities.

28. In 2024, the Company undertook a comprehensive redesign of all product packaging to ensure uniform compliance with the standards described above — including universal 21-and-over labeling, standardized 25-milligram mitragynine servings, enhanced tamper-evident and child-resistant closures, and large-format, consumer-friendly labeling. This initiative consumed substantially the entire calendar year 2024 for design, procurement, and receipt of new packaging materials. Production using the redesigned packaging commenced in the fourth quarter of 2024.

29. In connection with the packaging transition, the Company made the strategic decision to withhold shipment of products bearing the new packaging until the end of February 2025 to allow existing inventory bearing the prior packaging to clear the marketplace. This decision, while the Company believes it to have been the responsible course, resulted in near-zero revenue in January 2025 and significantly depressed revenue in February 2025.

*Facility Expansion and Capital Investment*

30. In furtherance of its commitment to manufacturing excellence, the Company entered into leases for approximately 150,000-square-feet, multi-building facilities in Draper, Utah. The facility was designed to transition the Company's manufacturing operations from what it characterized as "A-class" to "world-class" standards. The monthly lease obligation associated with this facility increased the Company's occupancy costs from approximately $50,000–$60,000

per month to approximately $220,000 per month.

31. By the spring of 2026, the Company had achieved NSF 455-2 certification — making it, I believe, the only NSF 455-2 certified kratom manufacturing facility in the United States. At the time of filing, the Company was approximately one month from achieving pharmaceutical-grade manufacturing certification.

32. In addition to the facility leases, the Company invested approximately $9 million in equipment and facilities for a dedicated extraction facility. This investment was financed with a combination of cash and debt from Mazuma Capital Corp. — the first time in the Company's history that it had taken on any such indebtedness. This capital commitment was initiated when the business was generating annualized revenue of approximately $98 million and was planned against an assumed operating run-rate of approximately $70 million. The Company's current annualized revenue has since contracted to approximately $30 million, rendering the debt service and fixed-cost structure associated with these investments unsustainable.

## **CURRENT FINANCIAL POSITION**

33. The convergence of the foregoing factors has placed the Company in severe financial distress. The Company's current annualized revenue of approximately $30 million is insufficient to service its existing obligations, which were structured for a business generating between $70 million and $98 million in annual revenue.

34. The Company's business that exists today remains viable. With the recent Utah legislation, the Company has contracted with a third party to manufacture the Company's products. The brands are recognized. The product is trusted by its consumer base. The Company has created a manufacturing infrastructure — including the only known NSF 455-2 certified kratom facility in the country — that represents a substantial competitive advantage, which it is replicating with its

new manufacturer. What is not viable, however, are the current leases in Utah, debt obligations with Mazuma, and ongoing litigation throughout the country with only a $30 million revenue base.

## RELIEF SOUGHT IN THE MOTIONS

### A. The Cash Management Motion

35. Pursuant to the Debtor's *Motion for Interim and Final Orders Authorizing (A) Continued Use of Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Interim Suspension of Section 345(b) Deposit and Investment Requirements; and (E) Granting Related Relief* filed contemporaneously herewith (the "***Cash Management Motion***"), the Debtor is requesting the authority to continue using its bank accounts at JP Morgan Chase, Rho Business Banking, First Citizens Bank & Trust Company, and Mountain America Credit Union in existing business forms.

36. Prior to the Petition Date, and in the ordinary course of its business, the Debtor maintained eleven bank accounts (the "***Bank Accounts***"). The bank accounts are maintained at Mountain America Credit Union ("***MACU***"), JPMorgan Chase Bank, N.A. ("***Chase***"), Rho Business Banking ("***Rho***") in partnership with Webster Bank, a division of Santander Bank, N.A. ("***Webster***"), and First Citizens Bank & Trust Company ("***First Citizens***," together with MACU, Chase, and Webster, each a "***Bank***" and collectively, the "***Banks***"), as indicated in the summary of the Bank Accounts attached to the Cash Management Motion as **Exhibit C**.[1] As of the Petition Date, the Bank Accounts held approximately $200,000 in the aggregate.

37. Chase, Webster and First Citizens are insured by the Federal Deposit Insurance Corporation (the "***FDIC***"). MACU is a credit union insured by the National Credit Union

---

[1] The Debtor believes, and has undertaken reasonable efforts to ensure, that **Exhibit A** lists all of the Debtor's bank accounts.

Administration (the "***NCUA***"). Additionally, Chase, First Citizens and Webster are designated as an authorized depository ("***Authorized Depository***") by, the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***") pursuant to the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "***U.S. Trustee Guidelines***"). A description of the flow of funds through the Bank Accounts is provided below:

| Accounts | Description of Bank Accounts |
|---|---|
| **Operating Account**<br><br>MACU *checking account ending 4376* | The Debtor maintains its main operating account with MACU (the "**Operating Account**") to fund operations in the ordinary course of business, typically by debits and credits.<br><br>The Operating Account will typically receive B2B customer deposits, make disbursements to the Debtor's payroll servicer to cover expenses for employees, pay vendors and other services of the Debtor, and other related operating expenses.<br><br>As of the Petition Date, the Operating Account had a minimal balance as it works in conjunction with the MACU sweep account ending 4376, where the cash balance earns interest. |
| **Sweep Account**<br><br>MACU *sweep account ending 4376* | The Debtor maintains a sweep account (the "**Sweep Account**") primarily for the purpose of earning interest on funds that are not immediately needed for payments through the Operating Account. Funds in the Sweep Account are transferred daily to the Operating Account to pay vendors and other operating expenses.<br><br>As of the Petition Date, the Sweep Account had a balance of approximately $170,000.00. |
| **Money Market Account**<br><br>MACU *money market account ending 4376* | The Debtor maintains a money market account at MACU as an additional interest-bearing account.<br><br>As of the Petition Date, the MACU money market account had a balance of approximately $100.00. |
| **GMA Acquisitions Account**<br><br>MACU *checking account ending 4201* | Following the Debtor's acquisition of the assets of GMA Acquisitions LLC, the Debtor continues to maintain a checking account at MACU in the name of GMA Acquisitions that receives deposits from credit card processors for a portion of the Debtor's direct-to-consumer |

| | |
|---|---|
| | business. The balance of this account sweeps daily to the Operating Account.<br><br>As of the Petition Date, the GMA Acquisitions checking account had a balance of approximately $1,500.00. |
| **Rho/Webster Account**<br><br>*Checking account ending 3246* | The Debtor maintains a secondary checking account at Webster through Rho. This account serves as a secondary operating account that functions much like the Operating Account and funds payments for the Debtor's company credit card through Rho.<br><br>As of the Petition Date, the Rho/Webster checking account had a balance of approximately $25,000.00. |
| **Chase Account**<br><br>*Checking account ending 7618* | The Debtor maintains a checking account at Chase that was originally in the name of SSV, LLC and still receives deposits from credit card processors. The Debtor periodically transfers funds from this Chase checking account to the Rho/Webster Account.<br><br>As of the Petition Date, the Chase checking account had a balance of approximately $5,000.00. |

38. The Debtor also maintains the following non-active bank accounts (the "***Non-Active Bank Accounts***"). The Debtor maintains Non-Active Bank Accounts at First Citizens (checking account ending 2515, money market account ending 2279 and demand deposit account ending 4684) and at MACU (a savings account ending 4376 and a savings account ending 4201). These Non-Active Bank Accounts have minimal or zero balances and activity, and the Debtor does not intend to utilize these Non-Active Bank Accounts in its daily operations.

39. The Bank Accounts are used for the business activities and operations of the Debtor, and any cash used by the Debtor during the bankruptcy case will be sourced from its main business checking account, subject to the Court's approval where appropriate. Any fees incurred to maintain the Bank Accounts are paid by the Debtor.

40. I believe that the cash management system is similar to those commonly employed by businesses comparable in size and scale to the Debtor to help control funds, ensure cash

availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities business activities. I believe that any disruption of the Cash Management System would be materially detrimental to the Debtor's operations because its business requires prompt access to cash and accurate cash tracking.

41. I understand that the cash management system is tailored to meet the Debtor's operating needs, thereby enabling the Debtor to control and monitor corporate funds, ensure cash availability and liquidity, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

42. Broadly, I understand that cash moves though the Debtor's cash management system as follows:

- **Receipts:** The Debtor primarily receives cash receipts from its customers related to the products and services it sells to those customers. These funds are received into the Operating Account, the Chase Account, the GMA Acquisitions Account and the Rho/Webster Account. The flow of funds is described above, and the Debtor will actively manage the Operating Account and Sweep Account to ensure that the aggregate balance does not exceed the NCUA insurance limit of $250,000.

- **Disbursements:** The Operating Account funds most of the Debtor's operating expenses, including payment of trade creditors, operating expenses, and debt payments. Certain funds from the Operating Account are also used to pay payroll costs for the Debtor's employees. The Rho/Webster Account is also used to pay the Debtor's accounts payable and operating expenses.

43. Additionally, in the ordinary course of business, the Debtor uses checks, correspondence and numerous other business forms including, but not limited to, invoices, purchase orders and envelopes (collectively, the "***Business Forms***"). To minimize administrative expense and delay, the Debtor requests authority to continue to use its Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's "Debtor-in-Possession" status.

44. I also believe that allowing the Debtor to use its existing Business Forms without

reference to "Debtor-in-Possession" status is in the best interest of the Debtor's estate and no parties in interest will be prejudiced by the requested relief. If the Debtor was required to use new business forms, the estate could incur unnecessary costs and administrative burdens. Moreover, the vendors doing business with the Debtor have been or will be sent notice of the commencement of this case. Because of the notice to the creditors and the status of the Debtor's business, I believe that changing business forms is both unnecessary and unduly burdensome to the Debtor and its estate.

45. Based on the foregoing, I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor, its estate, and all other parties in interest and should be approved.

**B. The Lease Rejection Motion**

46. Pursuant to the Debtor's *Motion for Entry of an Order (I) Authorizing the Rejection of Unexpired Leases of Nonresidential Real Property Effective as of the Date of the Motion; (II) Abandoning Certain Personal Proeprty at the Leased Premises; and (III) Granting Related Relief* filed contemporaneously herewith (the "***Lease Rejection Motion***"), the Debtor is requesting the authority to reject two unexpired leases with the rejection to be effective as of October 7, 2026 (the "Rejection Date") and to abandon certain *de minimis* equipment, fixtures, furniture, or other personal property located at the premises.

47. Prior to the Petition Date, the Debtor entered into two leases to produce and sell its products: the Denali Lease and Everest Lease (as defined in the Lease Rejection Motion and together, the "***Leases***").

48. I do not believe the Leases provide any value to the Debtor or its estate. Specifically, the Leases were entered into to allow the Debtor to create a state-of-the-art facility to

manufacture its products. As noted above, the State of Utah enacted legislation on May 6, 2026 prohibiting the production and sale of kratom extracts or products made from kratom extracts that are not considered "pure leaf kratom" in Utah. Utah Code § 4-45-102(1) (2026). While the new Utah kratom laws allow for products to continue to be manufactured in Utah until March 6, 2027, the Debtor ceased production of its products in Utah on or about July 31, 2026 and is continuing to lawfully sell its existing product inventory—all of which are below the 7-OH limits under the new law—in other states. Accordingly, the Debtor no longer has a use for the Premises (as defined in the Lease Rejection Motion).

49. Prior to the Petition Date, the Debtor vacated the Denali Property and the Everest Property (each as defined in the Lease Rejection Motion) and generally delivered possession to the respective landlords. The Debtor also arranged for a suitable subtenant to take over the Leases, but the landlords have unreasonably withheld their consent to date. As such, the continued obligation to pay rent or otherwise perform under the Leases for essentially vacant and soon-to-be-vacant property will impose upon the Debtor burdensome administrative costs that will be detrimental to the Debtor's estate. In addition to its obligations to pay rent under the Leases, the Debtor may be obligated to pay certain real property taxes, utilities, insurance, and other related charges associated with the Leases.

50. I believe such costs constitute a wasteful drain of estate assets. Additionally, the ongoing costs of the Leases exceed any meaningful benefits that the Debtor could potentially achieve from assignments or subleases of the Leases. Given these circumstances, the prompt rejection of the Leases as of the Petition Date is necessary and in the best interests of the Debtor, its estate, and its creditors.

51. Based on the foregoing, I believe that the relief requested in the Lease Rejection

Motion is in the best interest of the Debtor, its estate, and all other parties in interest and should be approved.

**C. <u>The Insurance Motion</u>**

52. Pursuant to the Debtor's *Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Prepetition Insurance Policies and (B) Pay All Prepetition Obligations in Respect Thereof, and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto* filed contemporaneously herewith (the "***Insurance Motion***"), the Debtor seeks entry of an order (i) authorizing, but not directing, the Debtor, in its discretion, to (a) continue to maintain and administer prepetition insurance policies and revise, extend (including obtaining tail or run-off coverage), renew, supplement, or change such policies, as needed; and (b) pay or honor outstanding obligations on account of prepetition insurance policies in the ordinary course of business; and (ii) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing.

53. In connection with the operation of its business, the Debtor maintains director's and officer's liability, general liability, and property insurance coverage under insurance contracts (collectively, the "***Insurance Policies***") with various insurers (the "***Insurers***") listed on **<u>Exhibit C</u>** attached to the Insurance Motion. I believe all of the Insurance Policies are essential to the protection and continued operation of the Debtor's business.

54. Under the Insurance Policies, the Debtor is required to pay premiums based on fixed rates set by the Insurers. The annual premiums for the Insurance Policies amount to approximately $443,020.43 (the "***Insurance Obligations***"). When obtaining the Insurance Policies, the Debtor financed the payments of certain insurance premiums through premium finance agreements with First Insurance Funding. As such, the Debtor is current on all Insurance

Policies as of the Petition Date.

55. Also, the Debtor has historically utilized a brokerage service to market and source insurance policies (the "***Broker***"). The Broker assists the Debtor in obtaining comprehensive insurance coverage for the Debtor's operations by, among other things, assisting the Debtor with the procurement and negotiation of the Insurance Policies and enabling the Debtor to obtain those policies on advantageous terms at competitive rates. The fees paid to Broker (the "***Broker Fees***") depends on the scope of the Insurance Policies needed for the Debtor's business and have varied significantly in the past several years due to the Debtor winding down certain business operations.

56. I believe that the nature of the Debtor's business makes it essential for the Debtor to maintain its Insurance Policies on an ongoing and uninterrupted basis. The non-payment of any premiums, deductibles or related fees under the Insurance Policies could result in one or more of the Insurers terminating or declining to renew their insurance policies or refusing to enter into new insurance policies with the Debtor in the future. If any of the Insurance Policies lapse without renewal, the Debtor could be in violation of state and/or federal law and be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

57. In addition, pursuant to contractual obligations with numerous third-party property owners, customers, suppliers, distributors, contractors and other contract counterparties, the Debtor is obligated to remain current with respect to certain of the Insurance Policies. Furthermore, the Debtor must maintain the Insurance Policies to comply with the operating guidelines of the Office of the United States Trustee. Thus, for the Debtor to maintain its operations in compliance with various legal and contractual obligations, the Debtor must be able to continue the Insurance Policies without disruption.

58. The Debtor's ability to maintain and honor its obligations to Insurers in a timely

manner is critical to the ongoing operation of its business, and, therefore, necessary to maximize the value of the Debtor's estate. Thus, I believe the continuation of the Insurance Policies is within the sound business judgment of the Debtor and will benefit the Debtor's creditors by preserving the property of the Debtor's estate.

59. For the foregoing reasons, the Debtor submits, and I believe, that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11, and therefore should be approved.

**D. <u>The Wages Motion</u>**

60. Pursuant to the Debtor's *Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* filed contemporaneously herewith (the "***Wages Motion***"), the Debtor is seeking authority to (i) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, in an aggregate amount not to exceed $130,000 pursuant to the Interim Order and $130,000 pursuant to the Final Order; and (b) granting related relief.

61. The Debtor's employees are essential to the success of its business. The Debtor prides itself on its innovative development and quality control of its products. Critical to the Debtor's operations are its employees. Without the continued service and dedication of the Employees, it will be difficult, if not impossible, to operate the Debtor's business without interruption, and resulting prejudice to the Debtor's ability to maximize the value of its estate.

Moreover, its employees rely on their paychecks to pay living expenses and will suffer irreparable harm if the Employee Obligations are not paid timely.

62. As of the Petition Date, the Debtor employs approximately 33 full-time employees (the "***Employees***"). The Debtor believes that it is vital that it pay the prepetition wages and business expenses of its Employees, honor other employee benefits and continue to contribute to the Employees' benefit plans to adequately incentivize the Employees. Furthermore, the Debtor has several Employee Benefits Programs, as defined and more fully described in the Wages Motion. The Debtor believes that if the Wages Motion is not granted and it is not able to continue these programs, its efforts to restructure its operations and maximize recovery for its creditors will be jeopardized.

63. For the foregoing reasons, I believe that the relief requested in the Wages Motion is in the best interest of the Debtor, its estate, and its creditors, and therefore should be approved.

**E. <u>Taxes Motion</u>**

64. Pursuant to the Debtor's *Motion for Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto* filed contemporaneously herewith (the "***Tax Motion***"), the Debtor seeks authority, but not direction, to pay the prepetition Taxes and Fees owed to the governmental authorities identified therein (the "***Authorities***"), subject to a cap of $30,000 under the proposed interim order and $60,000 under the proposed final order, and authorization for banks to honor and process related check and electronic transfer requests.

65. In the ordinary course of business, the Debtor incurs or collects and remits a variety of taxes, including, without limitation, (a) sales taxes, (b) use taxes, (c) property taxes, and

(d) certain other miscellaneous taxes (collectively, the "***Taxes***"), to various federal, state, local, foreign taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies thereof.[2] The Debtor also incurs various fees for business licenses and permits and various other fees and assessments (collectively, the "***Fees***," and together with the Taxes, the "***Taxes and Fees***") in connection with the operation of its business. The Debtor remits the Taxes and Fees to the Authorities in accordance with applicable law.

66. The Debtor estimates that, as of the Petition Date, the total amount of prepetition Taxes and Fees currently owed to the Authorities does not exceed approximately $30,000 in the aggregate, related to prepetition Taxes and Fees that have accrued but not assessed against the Debtor.

67. I understand that many Authorities impose personal liability on directors and/or responsible officers of entities responsible for collecting or paying certain taxes or fees to the extent that such taxes or fees are not remitted. Although I believe that all taxes and fees for which the Debtor's directors and/or responsible officers may be personally liable are described in the Tax Motion, it is possible that other prepetition obligations similar in nature (and in threat of personal liability) may be discovered by the Debtor subsequent to the filing of the Tax Motion. To the extent that such prepetition obligations exist, the Debtor will consider such obligations "Taxes and Fees," as that term is defined and used in the Tax Motion, and request the authority to pay such Taxes and Fees as they may arise in the ordinary course of its business.

---

[2] In addition to the Taxes discussed herein, the Debtor is required by law to withhold from its employees' pay amounts related to, among other things, federal, state, and local income taxes and social security and Medicare taxes (collectively, the "***Employee Payroll Taxes***") for remittance to the appropriate federal, state, or local taxing authorities. The Debtor must then match from its own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (together with the Employee Payroll Taxes, the "***Payroll Taxes***"). Any relief requested with respect to the Payroll Taxes is requested in the Wages Motion, filed contemporaneously herewith.

68. I believe that the timely payment of the Taxes and Fees is critical to the Debtor's ability to preserve and maximize value for the benefit of all stakeholders. Failure to pay these obligations could damage the Debtor's relationships with the Authorities and cause the Authorities to take precipitous action, including, among other things, conducting audits, asserting liens, attempting to revoke licenses and permits, seeking to impose liability against the Debtor and its officers and directors and, if applicable, seeking to lift the automatic stay, all of which could disrupt the Debtor's restructuring efforts and impose significant costs on the Debtor's estate. I believe that payment of the Taxes and Fees will avert these potentially detrimental and costly governmental actions and potential interest charges and penalties that would be incurred if the Taxes and Fees are not paid timely. Thus, I believe that granting the relief requested in the Tax Motion will maximize the value of the Debtor's estate and benefit creditors.

69. Moreover, I believe that any failure to pay the Taxes and Fees could impair the Debtor's ability to continue its business operations, and any unexpected or damaging interruption of the Debtor's operations during this Chapter 11 Case could diminish estate value and frustrate the Debtor's restructuring efforts. Therefore, I believe that the Debtor can only meet its fiduciary duties as a debtor in possession by paying the Taxes and Fees in the ordinary course of business.

70. Furthermore, the Authorities might assert that certain of the Taxes and Fees are so-called "trust fund" taxes that the Debtor is required to collect from third parties and hold in trust for the benefit of the Authorities. To the extent that the Debtor collects the Taxes and Fees on behalf of the Authorities, those Taxes and Fees may not constitute property of the Debtor's bankruptcy estate. As payment of trust fund taxes would not prejudice the rights of any of the Debtor's other creditors or other parties in interest, I believe that the Court should authorize the Debtor to pay the Taxes and Fees that constitute trust fund taxes.

71. In the event the Debtor fails to pay "trust fund" taxes, my understanding is that the Debtor's directors and officers could be subject to lawsuits or criminal prosecution during the pendency of this Chapter 11 Case to the extent of non-payment. Such potential lawsuits would be extremely disruptive for the Debtor, for the named officers and directors whose attention to the Chapter 11 process is required, and for the Court, as the Court might be asked to entertain various requests for injunctions with respect to the potential state court actions against such individuals. Even the possibility of any such lawsuit or criminal prosecution would distract the Debtor and its directors and officers, and impede their respective efforts in this Chapter 11 Case. Furthermore, the Authorities may audit the Debtor if the Taxes and Fees are not paid timely. I believe that payment of the Taxes and Fees will, therefore, prevent a loss of focus on the part of the Debtor's directors, officers, and other employees resulting from the risk of personal liability and/or audits.

72. For the foregoing reasons, I believe that granting the relief requested in the Tax Motion is appropriate and in the best interests of the Debtor's estate and creditors.

**F. Utilities Motion**

73. In connection with the operation of its business, various utility companies (each, a "***Utility Company***," and collectively, the "***Utility Companies***") provide natural gas, electricity, waste disposal, and IT and other similar services (collectively, the "***Utility Services***") to the Debtor. Attached to the Debtor's *Motion for Interim and final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) establishing Procedures for Determining Additional Adequate Assurance of Payment ,and (IV) Granting Related Relief* (the "***Utilities Motion***") as Exhibit A[3] is a list (the

---

[3] The Debtor has endeavored to identify all of the Utility Companies and list them on Exhibit A attached to the Utilities Motion. However, inadvertent omissions may have occurred, and the omission from Exhibit A attached to the Utilities

"***Utility Company List***") of Utility Companies providing services to the Debtor as of the Petition Date. I believe that the Debtor could not operate its business or serve its customers in the absence of continuous Utility Services. Thus, I believe that any interruption in such services would disrupt the Debtor's day-to-day operations and undermine its ability to remain profitable on a go-forward basis.

74. Historically, the Debtor has paid on average approximately $30,000 per month on account of the Utility Services relating to the properties where the Debtor will continue to operate during this Chapter 11 Case. I believe that the termination or cessation (even if only temporary) of any of the Utility Services will result in disruption to the Debtor's business, as well as a potential loss of revenue and profits. Any interruption of the Utility Services would diminish or impair the Debtor's efforts to preserve and maximize the value of its estate and to successfully prosecute this Chapter 11 Case. It is therefore critical, in my view, that the Utility Services continue uninterrupted.

75. The Debtor intends to pay undisputed post-petition charges for the Utility Services when due in the ordinary course of business. Nevertheless, to provide adequate assurance of payment for future services to the Utility Companies, the Debtor proposes to deposit a sum of $6,500 (the "***Utility Deposit***"), which, as I understand it and after rejection of certain real property leases, represents approximately two (2) weeks of the Debtor's estimated aggregate monthly cost for the Utility Services to be incurred after the Petition Date, into a segregated account (the "***Utility Deposit Account***") within twenty (20) days of the Petition Date, to be maintained during the pendency of this Chapter 11 Case in the manner provided for in the Utilities Motion and the

---

Motion of any entity providing Utility Services to the Debtor shall not be construed as an admission, waiver, acknowledgement, or consent that section 366 of the Bankruptcy Code does not apply to such entity. In addition, the Debtor reserves the right to assert that any of the entities now or hereafter included on the Utility Company List are not "utilities" within the meaning of section 366 of the Bankruptcy Code.

proposed orders granting the relief requested therein.

76. I believe that the Utility Deposit constitutes adequate assurance of payment to the Utility Companies. However, the Debtor proposes to establish procedures for determining additional adequate assurance of future payment, if any, and authorizing the Debtor to provide additional adequate assurance of future payment to the Utility Companies (the "***Assurance Procedures***"), pursuant to which a Utility Company may request additional adequate assurance of payment (an "***Additional Assurance Request***"). If any Utility Company believes additional assurance is required, it may make an Additional Assurance Request pursuant to the Assurance Procedures. The proposed Assurance Procedures are set forth with particularity in the Utilities Motion.

77. In addition to establishing the Assurance Procedures, the Debtor is seeking a final hearing (the "***Final Hearing***") on the Utilities Motion to be held within thirty (30) days of the Petition Date to ensure that, if a Utility Company argues it can unilaterally refuse service to the Debtor on the thirty-first (31st) day after the Petition Date, the Debtor will have the opportunity, to the extent necessary, to request that the Court make such modifications to the Assurance Procedures in time to avoid any potential termination of the Utility Services.

78. It is possible that, despite the Debtor's efforts, certain Utility Companies have not yet been identified by the Debtor or included on the Utility Company List (each, an "***Additional Utility Company***," and collectively, the "***Additional Utility Companies***"). Thus, promptly upon the discovery of an Additional Utility Company, the Debtor will increase the Utility Deposit by an amount equal to approximately two (2) weeks of the Debtor's estimated aggregate utility expense for each Additional Utility Company identified after the Petition Date. In addition, the Debtor is requesting that the Court mandate that any Additional Utility Companies identified after the

Petition Date be subject to the terms of the proposed orders granting the relief requested in the Utilities Motion (including the Assurance Procedures) once entered by the Court.

79. I believe that the Debtor's proposed method of furnishing adequate assurance of payment for post-petition Utility Services is not prejudicial to the rights of any Utility Company, and is in the best interests of the Debtor, its estate, and creditors. As uninterrupted Utility Services are vital to the Debtor's business and, consequently, to the success of this Chapter 11 Case, I believe that the relief requested in the Utilities Motion is necessary and in the best interests of the Debtor, its estate, and creditors. Such relief, in my view, will ensure that the Debtor's business operations will not experience any unexpected and damaging interruptions during the pendency of this Chapter 11 Case, and will provide the Utility Companies and the Debtor with an orderly and fair procedure for determining adequate assurance of payment.

80. For the foregoing reasons, I believe that granting the relief requested in the Utilities Motion is appropriate and in the best interests of the Debtor's estate and creditors.

## CONCLUSION

81. I have reviewed each of the Motions. All of the facts set forth in the Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtor's operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtor's management team and the Debtor's advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtor's operations and financial condition. Accordingly, on behalf of the Debtor, I respectfully request that the relief requested in each of the Motions be granted, because such relief is critical to stabilizing and facilitating the Debtor's efforts to achieve a recapitalization or sale during the pendency of this Chapter 11 Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 8th day of October 2026.

**DIVERSIFIED BOTANICS, INC.**
Debtor and Debtor in Possession

Signed by:
FCE02CEA16D84FC...

Ryan Niddel
Chief Executive Officer